UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

In re                                                   Chapter 11

GLOBAL AVIATION HOLDINGS, INC., *et al.,*               Case Nos.      12-40783 (CEC)
                                                        12-40782 (CEC), 12-40784 (CEC)
                                                        12-40785 (CEC), 12-40786 (CEC)
                                                        12-40787 (CEC), 12-40788 (CEC)
                                                        12-40789 (CEC), 12-40790 (CEC)
                            Debtors.                    Jointly Administered
---------------------------------------------------------------x
DANIEL SCHROEDER and CHARLES
MARTIN, JR., individually and on behalf of
all others similarly situated,                          Adv. Proc. No. 12-1227-CEC

                            Plaintiffs,

            -against-

GLOBAL AVIATION HOLDINGS, INC.,

                            Defendant.
---------------------------------------------------------------x
DANIEL SCHROEDER and CHARLES
MARTIN, JR., individually and on behalf of
all others similarly situated,                          Adv. Proc. No. 12-1235-CEC

                            Plaintiffs,

            -against-

WORLD AIRWAYS, INC.,

                            Defendant.
---------------------------------------------------------------x

<u>DECISION</u>

APPEARANCES:

Allen P. Press, Esq.                          Hunter Murdock, Esq.
Suite 700 Pierre Laclede Center               Jonathan S. Henes, Esq.
St. Louis, Missouri 63105                     Kirkland & Ellis LLP
Attorney for Plaintiffs                       153 East 53rd Street
                                              New York, New York 10022
                                              Attorneys for the Defendants

CARLA CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the motion of Global Aviation Holdings, Inc. ("Global") and World Airways, Inc. ("World," together with Global, the "Defendants"), seeking summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), made applicable here by Federal Rule of Bankruptcy Procedure 7056, in the adversary proceedings brought against them under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109 (the "WARN Act") by Daniel Schroeder and Charles Martin, Jr., individually and on behalf of all others similarly situated (the "Plaintiffs").

Plaintiffs are airline pilots who were furloughed by World after the commencement of this bankruptcy case.  Plaintiffs claim that World ordered a "mass layoff" without giving 60 days notice as required under the WARN Act.  This claim is premised on the assumption that the Kansas City, Missouri airport ("KMCI"), which they allege is World's pilot base, constitutes a "single site of employment" for WARN Act purposes.  Defendants point out that, while KMCI is used as a notional "base" to calculate contractual commuting time for pilots, World and its pilots have no physical connection with KMCI whatsoever. As such, Defendants argue that as a matter of law, KMCI is not a "single site of employment" at which there could have been a "mass layoff" under the WARN Act.  For the reasons set forth below, Defendants' motion is granted, and these adversary proceedings are dismissed.


## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1996.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B). This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy

Procedure 7052.

## BACKGROUND

The following facts are undisputed.

World is a charter aircraft operator that does not generally fly fixed routes.  WARN Act Debtors' Statement of Material Facts, ECF No. 19[1] ("WAD Stmt.") [2] ¶ 1; Declaration of Cheryl Hiles, ECF No. 18 ("Hiles Decl.") ¶ 4.  Instead, World supplies aircraft and crew to fly customers to and from requested destinations.  WAD Stmt. ¶ 1; Hiles Decl. ¶ 4.  World's pilots live anywhere they choose, and generally travel on commercial flights between their homes and the locations where the charter flights they are staffing begin and end.  WAD Stmt. ¶ 2; Hiles Decl. ¶ 4.  Pursuant to a Collective Bargaining Agreement (the "CBA") between World and its pilots' union, the International Brotherhood of Teamsters ("IBT"), pilots select flights that they would like to fly through a "bidding system," and their compensation is calculated, in part, based on travel time required to get to and from their scheduled flights.  WAD Stmt. ¶ 3; Hiles Decl. ¶ 5.  The CBA requires World to designate certain "bases" for purposes of computing commuting distances under these bidding and compensation schemes.  WAD Stmt. ¶¶ 4, 5; Hiles Decl. ¶¶ 6, 7.

Prior to February 2008, the CBA required World to designate one "base" on each side of the Mississippi River, and each pilot was assigned one of the bases for purposes of "[b]idline construction," "[a]warding and assignment of Crewmember Bases," and "[d]etermination of Per

---

[1] References to ECF Docket numbers are to the Shroeder, *et al.* v. Global Aviation case, No. 12-1227-cec.
[2] Plaintiffs admit all factual assertions contained in the WARN Act Debtors' Statement of Material Facts.  <u>See</u> Plaintiffs' Response to WARN Act Debtor's Consolidated Statement of Material Facts.

Diem and THP [Trip Hour Pay] payments," [3].  Plaintiffs' Counter-Statement of Contested Facts, ECF No. 22 ("Pls. Stmt.") ¶ 2; Declaration of Gary Goodpaster ("Goodpaster Decl."), ECF No. 25, ¶ 3, Ex. 1; WAD Stmt. ¶ 4; Hiles Decl. ¶ 6.  Because these locations were to be used for computation purposes only, it was not necessary that the locations chosen by World have any relationship to World's actual operations or to where any of the pilots actually resided.  WAD Stmt. ¶ 4; Hiles Decl. ¶ 6.

In February 2008, World and IBT entered into a Letter of Agreement (the "LOA"), which changed the prior system of designating two national bases for these purposes.  WAD Stmt. ¶ 5; Hiles Decl. ¶ 7; Pls. Stmt. ¶ 2; Goodpaster Decl. ¶ 3.  The LOA provides, *inter alia*, that each pilot will be "based" at his "designated airport," intended to be the airport closest to the pilot's residence, for purposes of "[p]ay calculations," "[c]ommercial movements, including the costs of the movement and required hotel accommodations," and "[c]rew route construction."  WAD Stmt. ¶ 5; Hiles Decl. ¶ 7, Ex. A ("LOA"), at 1.  The LOA further provides that pilots are shown to be "based at KMCI for electronic record keeping and bidline travel planning *only*," and that "the construction of Regular Bidlines will incorporate a travel period from KMCI to the point of departure for the first live flight and will be *used for planning purposes only*."  LOA, at 1 (emphases added).

This means that, under the LOA, when constructing trips for pilots to bid on, World calculates commuting time for which the pilot flying the trip will be compensated by using KMCI as if it were the place from which the pilot will be commuting.  WAD Stmt. ¶ 6.  KMCI was chosen because it is located roughly in the center of the country, and therefore deemed reasonably equitable to all parties concerned.  WAD Stmt. ¶ 7; Hiles Decl. ¶ 8.  The LOA

---

[3] Neither party has submitted evidence that precisely defines these terms, but it is undisputed that they relate to the bidding and compensation schemes described above.

recognizes that a pilot's actual commuting time to and from a job may well be longer or shorter than the theoretical commuting time from KMCI. LOA, at 1-2. Neither of the Debtors has facilities, operations, employees, representatives or agents at KMCI. WAD Stmt. ¶¶ 7, 8; Hiles Decl. ¶¶ 8, 9. World has not chartered a flight to or from KMCI since 2008, and few World pilots actually live in that area. WAD Stmt. ¶¶ 7, 8; Hiles Decl. ¶¶ 8,9. All of World's management personnel work from its offices in Peachtree, Georgia, and perform all flight crew assignments, supervision, and performance evaluations from that site. WAD Stmt. ¶ 9; Hiles Decl. ¶ 10.

On February 5, 2012, Defendants, together with other affiliated entities, filed petitions for bankruptcy relief under Chapter 11 of Title 11, U.S.C. In the months after filing its petition, World furloughed a number of pilots, including Plaintiffs, as part of a series of layoffs. WAD Stmt. ¶ 10. On July 31, 2012, Plaintiffs filed a class action complaint on behalf of all World pilots against Global, as the parent company of World. On August 3, 2012, Plaintiffs filed an amended complaint against Global, and a substantially identical complaint against World (together, the "Complaint").[4]

The Complaint alleges that Defendants violated the WARN Act by ordering a "mass layoff" of the Plaintiffs and other class members without giving them 60 days written notice of the furloughs. Amended Adversary Proceeding Class Action Complaint, ECF No. 6 ("Complaint"[5]) ¶ 1. The Complaint is premised on the assumption that for purposes of establishing that a "mass layoff" occurred under the WARN Act, KMCI is World's "pilot base," at which more than 50 and greater than 33% of its pilots were furloughed within the 70 day

---

[4] The only difference between the two complaints is the additional allegation in the complaint against Global that World and Global are a "single employer" of the class members under the WARN Act. Global does not dispute that allegation for purposes of this summary judgment motion.

[5] Citations to the paragraphs in the Complaint are to the complaint filed in Shroeder, *et al.* v. Global Aviation, No. 12-1227-cec.

period between March 31, 2012 and June 8, 2012.  Complaint ¶ 22.  Plaintiffs do not dispute that there was no "mass layoff," as that term is defined by the WARN Act, at World's facility in Peachtree, Georgia.  WAD Stmt. ¶¶ 13, 14.

On October 19, 2012, Defendants filed motions for summary judgment in these two adversary proceedings.  Defendants point out that in order to impose liability under the WARN Act, a plaintiff must show that an employer ordered a "mass layoff" at a "single site of employment."  Defendants argue that because they have no physical presence or other relationship with KMCI, and because World pilots do not routinely travel to KMCI as part of their work, KMCI is not a "single site of employment" as defined by the regulations promulgated under the WARN Act, and the mere fact that KMCI is used as a notional "base" to calculate contractual commuting time for the pilots is insufficient to transform it into a "single site of employment."

On November 7, 2012, Plaintiffs filed a memorandum in opposition to Defendants' motion, arguing that KMCI is indeed Plaintiffs' "single site of employment" with World. In support of their contention, Plaintiffs note that the LOA refers to KMCI as the "pilot base," and point to a number of other documents in which World referred to KMCI as the "base" or "home base" for its pilots.  Plaintiffs argue that Defendants' view of a "single site of employment" is too narrow, and that such a construction would defeat the remedial purposes of the WARN Act. Plaintiffs advocate a more expansive interpretation of the term "single site of employment" that would include KMCI even absent any physical connection to it by World or its pilots.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue of material fact to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A fact is considered material if it "might affect the outcome of the suit under the governing law." Id. at 248. No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted). On the other hand, in reviewing a motion for summary judgment, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Kessler v. Westchester County Dept. of Social Services, 461 F.3d 199, 206 (2d Cir. 2006) (citation omitted). "The nonmoving party must show that there is more than a metaphysical doubt regarding a material fact, and may not rely solely on self-serving conclusory statements." Rosenman & Colin LLP v. Jarrell (In re Jarrell), 251 B.R. 448, 450-51 (Bankr. S.D.N.Y. 2000) (citations omitted).

The facts material to this motion are not in dispute.

## DISCUSSION

The purpose of the WARN Act is to protect employees, their families, and their communities by providing advance notice of impending plant closures and mass layoffs, to facilitate employees' transitions into unemployment, their search for alternative employment, and any training they may need to compete for new employment. See 20 C.F.R. § 639.1(a); Bader v. Northern Line Layers, 503 F. 3d 813, 817 (9th Cir. 2007). The WARN Act provides, in

relevant part, that:

> An employer shall not order a…mass layoff until the end of a 60-day period after the employer serves written notice of such an order—
>
> (1) to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee; and
>
> (2) to the State or entity designated by the State to carry out rapid response activities under section 2864(a)(2)(A) of this title, and the chief elected official of the unit of local government within which such closing or layoff is to occur."

29 U.S.C. § 2102(a).  A "mass layoff" is defined as "a reduction in force which…results in an employment loss at [a] *single site of employment* during any 30-day period," of at least 50 fulltime employees constituting 33% of the workforce, or 500 fulltime employees.  29 U.S.C. § 2101(3) (emphasis added).  The Secretary of Labor is authorized to promulgate regulations to carry out these statutory provisions.  See 29 U.S.C. § 2107.  An employer who violates the WARN Act is liable to compensate aggrieved employees for each day of the violation.  See 29 U.S.C. § 2104.

Under the regulations, the term "single site of employment" is specially defined in the context of traveling employees, such as airline pilots:

> For workers whose primary duties require travel from point to point, who are outstationed, or whose primary duties involve work outside any of the employer's regular employment sites (e.g., railroad workers, bus drivers, salespersons), the single site of employment to which they are assigned as their home base, from which their work is assigned, or to which they report will be the single site in which they are covered for WARN purposes.

20 C.F.R. § 639.3(i)(6).  This provision covers "traveling workers who report to but do not work out of a particular office."  See Bader, 503 F. 3d at 819 (citing Worker Adjustment and Retraining Notification, 54 Fed. Reg. 16,042, 16051 (Apr. 20, 1989)).  For these employees, the

regulation sets forth three criteria for establishing a "single site of employment": (1) the site to which employees were assigned as their home base; (2) the site from which their work is assigned; or (3) the site to which the employees report.  See Id. at 819.  Any of one of these alternatives may be used to establish a "single site of employment."  See Teamsters Local Union 413 v. Driver's, Inc., 101 F.3d 1107, 1110 (6th Cir. 1996); Ciarlante v. Brown & Williamson Tobacco Corp., 143 F. 3d 139 (3d Cir. 1998) ("If any one of these three inquiries can be answered in the affirmative, then the [site] is a covered 'single site of employment'").  It is undisputed that the Plaintiffs and the members of the class they represent are "workers whose primary duties require travel from point to point" within the meaning of this provision.

Plaintiffs acknowledge that KMCI is not a "single site of employment" under the second or third of the three criteria set forth in § 639.3(i)(6), as KMCI is not the site from which the pilots' work is assigned or the site to which the pilots report.  They further acknowledge that neither of the Defendants has facilities, operations, employees, representatives or agents at KMCI.  However, Plaintiffs contend that KMCI should be considered the pilots' "home base" under the first of the three criteria because KMCI is the pilots' "paper base."  Plaintiffs' Memorandum in Opposition, ECF No. 21 ("Opposition Brief"), at 8.  Plaintiffs assert that pursuant to the LOA, World "has only one pilot base, its base at KMCI."  Opposition Brief 8.  Plaintiffs also point to various business records in which World referred to KMCI as the pilots' "base," including pay records identifying KMCI as a departure and arrival station (Pls. Stmt., Ex. B, Ex. 1); the furlough notices identifying Plaintiffs' base as KMCI (Pls. Stmt., Ex. B, Ex.2); Defendants' pilot seniority list (Pls. Stmt., Ex. A, Ex. 3); and various other documents listing KMCI as the pilots' "base."

As a preliminary matter, Plaintiffs' contention that the LOA establishes KMCI as the

pilots' sole "base" is inaccurate; the LOA provides two "bases" to be used in connection with bidding and payment calculations.  LOA, at 1.  The LOA first provides that each pilot will be assigned a "designated airport," intended to be the airport closest to each pilot's residence.  LOA, at 1; WAD Stmt. ¶ 5.  Under the terms of the LOA, "the Company will base each crewmember at his designated airport for purposes of…[p]ay calculations[,] [c]ommercial movements, including the costs of the movement and required hotel accommodations[, and] [c]rew route construction." LOA, at 1.  Secondly, the LOA provides that "the Company will show all crewmembers based at KMCI for electronic record keeping and bidline travel planning only," and that "construction of Regular Bidlines will incorporate a travel period from KMCI to the point of departure to the first live flight and will be used for planning purposes only."  LOA, at 1.  The LOA thus designates KMCI as a theoretical starting point for computing distances when World prepares trips for pilots to bid on, and for purposes of calculating pilots' compensation and time off for commuting to and from their jobs.  In order to determine whether KMCI's status as a notional base for these purposes is sufficient to establish KMCI as a "single site of employment" under the WARN Act, it is necessary to understand the term "home base" as used in § 639.3(i)(6).

The WARN Act regulations do not define "home base," but courts have uniformly adopted the view that employees must have some physical presence at a site for it to constitute a "home base."  The first case to address the meaning of "home base" under § 639.3(i)(6) was Teamsters Local Union 413 v. Driver's, Inc., 101 F.3d 1107 (6th Cir. 1996).  There, the Sixth Circuit determined that eleven terminals maintained by a trucking company throughout the United States did not constitute a "single site of employment" under the WARN Act, concluding that the purposes and framework of the WARN Act and its regulations demonstrated that "geographic proximity provides the touchstone in determining what constitutes a 'single site.'"

Driver's, Inc., 101 F. 3d at 1108–09.  The Court noted that the first five provisions of § 639.3(i) focus on the geographic proximity of multiple sites as a basis for determining whether they should be considered a single site or multiple sites of employment under the WARN Act.  Id. at 1109.  The Court found this focus to be consistent with the WARN Act's concern for the impact of a large number of job losses in a single community, leading to the conclusion that each terminal, as the location where each employee "starts and ends his or her workweek," was a separate "single site of employment."  Id. at 1109–1110.  The Court further noted that § 639.3(i)(6) should not "be read in a vacuum," and thus "geographic considerations weigh heavy in the analysis."  Id. at 1110.

In Wiltz v. M/G Transport Svcs., Inc., 128 F. 3d 957 (6th Cir. 1997), the Sixth Circuit was again called upon to consider the meaning of "single site of employment" for traveling workers. There, furloughed towboat crewmembers argued that the towboat company's headquarters in Paducah, Kentucky, rather than the individual towboat-barges on which the crewmembers worked, constituted the crewmembers' "single site of employment" for WARN Act purposes. The Sixth Circuit agreed, rejecting the district court's conclusion that each of the towboat-barges constituted a separate "branch office."  Wiltz, 101 F. 3d at 961–62.  Acknowledging that where traveling employees are concerned, the §639.3(i)(6) criteria may point to a site where there is minimal geographic impact, the court distinguished Driver's, Inc., where the individual terminals to which the truckers were assigned constituted a "single site of employment" under other provisions of § 639.3(i): "[b]ecause the true focus was the terminal, and not the trucks themselves, the analysis of subpart (6), while applicable, was not dispositive…Thus, Driver's, Inc.'s presumption that absence of community impact cuts against a finding of "single site" is not fatal to plaintiffs' claims in this case."  Id. at 963.  Nonetheless, in finding that the company's

headquarters was a "single site of employment," the court cited, among other things, the physical connection between the crewmembers and headquarters: the court noted that 80% of the crews reported to Paducah for assignment to towboats, as well as the fact that all crew assignments were made from the Paducah office and that towboat crewmembers reported to the port engineer there.  Id. at 962.

In Ciarlante v. Brown & Williamson Tobacco Corp., 143 F. 3d 139 (3d Cir. 1998), the Third Circuit reviewed a WARN Act claim brought by Brown and Williamson's traveling sales representatives who were divided into geographical districts throughout the United States where they spent the majority of their time, but who also regularly contacted the company's administrative center in Virginia by telephone to check messages, order materials and supplies, receive instructions, and report to supervisors.  Ciarlante, 143 F. 3d at 141–43.  In concluding that the Virginia location did not constitute the employees' "home base" under § 639.3(i)(6), the Court found that "a traveling employee's 'home base' must at a minimum be a location at which the employee is physically present at some point during a typical business trip."  Ciarlante, 143 F. 3d at 146 (citing Driver's, Inc., 101 F. 3d at 1110; Wiltz, 128 F. 3d at 961–62).

The conclusion that physical connection to a location is essential to a finding that the location is a worker's "home base" was also adopted by the Ninth Circuit in Bader v. Northern Line Layers, 503 F. 3d 813, 817 (9th Cir. 2007).  There, furloughed construction workers argued that the company's headquarters, where all of its accounting and administrative functions took place, rather than the employees' actual work sites, constituted a "single site of employment" for WARN Act purposes.  Id. at 819.  The Ninth Circuit rejected this contention, noting that the workers received their assignments from and reported to local supervisors, and did not typically travel to headquarters.  Id. at 819–22.  Analyzing the meaning of "home base" for the purposes

of § 639.3(i)(6), the court agreed with the Third and Sixth Circuits that physical connection

between the workers and the location is crucial: "[W]e are persuaded by the reasoning of

Ciarlante and Driver's, Inc. that an employee's home base is the place from which he leaves at

the start of the work period and/or returns at the end of the work period, or at the very least,

where he is physically present at some point during a typical work period." Id. at 819–20.

Plaintiffs have not cited, nor has this court been able to find, any authority that would

support the view that a site may be considered an employee's "home base" under § 639.3(i)(6)

unless the employee is physically present at the site "at some point during a typical work

period." Bader, 503 F. 3d at 819–20. In order to establish a "home base" under the WARN Act,

a plaintiff must at the very least be able to show a physical connection between the employee and

the location in question. While the precise level of connection necessary to establish a "home

base" may vary from case to case, it is clear that Defendants' use of KMCI as a notional base for

purposes of preparing bids on jobs, and for calculating pilots' commuting compensation and

required time off, cannot establish it as a "home base" in any reasonable sense of the term.

Plaintiffs' employment has no actual connection to KMCI whatsoever, and World does not

maintain a presence there in any capacity. Rather, KCMI's status as a "base" is fictional: KMCI

is an arbitrary point on a map used as an imaginary starting and ending place for World's pilots,

for the sole purpose of simplifying bidline planning and calculating commuting compensation

and required time off. In light of the purposes of the WARN Act and the regulatory provisions

outlined above, there is no basis for considering KMCI a "home base" under the WARN Act

regulations.

The existence of World documents referring to KMCI as its pilot "base" or "home base"

does not alter this conclusion. The facts concerning the World pilots' lack of any actual

connection to KMCI are undisputed, and the use of these terms in Defendants' business records cannot transform KMCI into a "single site of employment" for WARN Act purposes.

Finally, Plaintiffs argue that KMCI should be considered the pilots' "single site of employment" under the "catch-all" provision found in 20 C.F.R. § 639.3(i)(8), which provides that "the term 'single site of employment' may also apply to truly unusual organizational situations where the above criteria do not apply."  Plaintiffs contend that, unlike other commercial airlines, World flies its pilots to its customers, which makes it a "truly unusual" organization to which the "catch-all" provision may apply.  This contention must be rejected, as this is not a situation where none of the other criteria set forth in § 639.3(i) apply.  Section 639.3(i)(6) provides that the site from which employees' work is assigned, or the site to which they report, may alternatively constitute a "single site of employment."  Plaintiffs concede that all World management personnel work from World's facility in Peachtree, Georgia, and that all flight crew assignments, supervision, and performance evaluations originate from there.  WAD Stmt. ¶ 9.  By its terms, therefore, the "catch-all" provision cannot be applied here, where a "single site of employment" can be identified under the provisions of § 639.3(i)(6).

## CONCLUSION

For the reasons set forth above, Defendants' motion is granted, and the complaints in these two adversary proceedings are dismissed.  A separate order will issue.



**Dated: Brooklyn, New York**
**November 26, 2012**

**Carla E. Craig**
**United States Bankruptcy Judge**